LUCY I. GREEN, APPELLEE, v. MORRIS K. GREEN, APPELLANT.

26 N. W. 2d 299

Filed February 28, 1947. No. 32153.

*Dryden & Jensen,* for appellant.

*Ray M. Higgins,* for appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

The plaintiff, Lucy I. Green, instituted an action for divorce against Morris K. Green, defendant, in the district court for Hall County. From a decree granting the plaintiff an absolute divorce upon the grounds of extreme cruelty, the custody of Lenda Lee Green, a minor daughter of the parties, an allowance of $20 per month for support, maintenance, and education of the child until she reaches the age of 16 years or until further order of the court, a judgment for alimony in the amount of $1,200, the title and possession of the family automobile, attorney fees and court costs, and dismissal of the defendant's cross-petition, the defendant appeals.

For convenience the appellant will hereinafter be referred to as the defendant and the appellee as the plaintiff.

Defendant assigns as error (1) the district court erred in finding for the plaintiff and against the defendant, and (2) the amount of alimony allowed the plaintiff is excessive.

The parties were married at Belmont, Kansas on January 21, 1941, and prior and subsequent thereto have been and are residents of this state. To this marriage one child, Lenda Lee Green, was born, now five years of age.

The record discloses that the defendant was engaged in various positions until in June 1942, when the parties moved to Long Beach, California where the defendant attended an electrical school for six weeks. Thereafter they moved to Oakland, California where the defendant was employed as a journeyman electrician. They lived with another family, the plaintiff keeping house and doing the washing thereby earning the rent, and the grocery bills were divided equally between the two families. In December 1942, the defendant received notice to report to Ft. Leavenworth, Kansas, for induction into the Army. When the defendant departed for the Army, the plaintiff testified he gave her $150 and took $90 with him. His testimony is that he gave her $550 and kept $25. In May 1941, the parties purchased a 1938 Chevrolet coupe. The plaintiff advanced $25, from a gift of $50 given her by her parents, on the purchase price of $310. The defendant testified that $90 constituted the down payment, and the monthly payments thereafter were $16 until the full amount was paid. The title of the car was placed in the plaintiff's name when the defendant left for the Army. The plaintiff went to her parents' home in Wood River, where she completed high school, using the $150. Thereafter the plaintiff was employed by a physician in Wood River. The defendant was sent to various camps, and stationed in New Jersey. She obtained employment in August 1943, the plaintiff joined him where he was and worked until the fore part of November 1944. Dur-

ing the course of this employment she paid $10 per week for an apartment and $1 per day for the care of the child. The defendant left for overseas duty January 29, 1945. During the time the defendant was in the Army the plaintiff received approximately $80 per month as an allotment, which she testified was used for living expenses. She returned to her parents' home and obtained employment at. $18 to $20 per week. From all of her employment she saved approximately $2,000. While overseas the defendant sent the plaintiff $200, the proceeds from the sale of a watch which she had given him; $185; and four checks for $35 each, a total of $525, which amount she kept separate from her account. She made total bank deposits in the sum of $1,668. She testified to various amounts she advanced to the defendant, which she estimated at $200.

The defendant returned home on Christmas Day, 1945. Six weeks prior thereto he requested the plaintiff to be at the home of his parents at that time. Due to a delay in the delivery of a telegram with reference to his return, the plaintiff remained at the home of her parents. The defendant arrived at his parents' home, borrowed his father's car and drove to the home of the plaintiff's parents. The testimony as to what occurred when he arrived there is in direct conflict and cannot be reconciled. The plaintiff's testimony as to what occurred at the time of his arrival and until they departed, and which is corroborated, is to the effect that he was very angry; did not greet the child until she requested him to do so; did not speak to the family; required her to hurry; and refused to eat with them. They left hurriedly for his parents' home. He inquired about the money he sent home, and she gave him the $525. The defendant denies that he ever received this money from the plaintiff.

There was much discussion and difficulty between the parties as to their future plans and where they were going to live. The defendant desired to go into

partnership with his father and farm, using his father's machinery. The plaintiff objected to such an arrangement. She felt they had sufficient resources to establish themselves in a home, and that she would be required to work with his parents, and she did not desire to live in what she termed "the hills." During the time the defendant was overseas the plaintiff located a place near her parents' home on a milk route, and wrote to him about it, maintaining they could be self-sustaining if they took it, and could use her father's machinery to farm with. She also talked to him about this place when he returned. The defendant wanted the rest of the money she had deposited, and wanted the title to the car placed in his name. After looking at a farm in close proximity to his parents and not taking it, they secured another place near his parents' home.

Needing some cattle to start out with, she withdrew $1,668 from the bank, gave him $168 and deposited $1,500 in the bank at Amherst near where they lived. The defendant claims $1,300 was deposited in the Amherst bank and that the plaintiff had $400 in addition that he saw. The defendant purchased two cows for $115 each, some chickens for $20.25, and the plaintiff paid $93 for a cow the defendant's father had purchased.

A short time after they moved to the place near the defendant's parents' home, the defendant's father came to their place and wanted the defendant to look at a farm. The defendant returned with a receipt for $750 which constituted a down payment on the farm. He had withdrawn this amount from the bank to make the payment. The plaintiff had no knowledge of this transaction. Apparently, due to the plaintiff's objection to the purchase, this amount was returned to the defendant and retained by him. He also retained $320 from the sale of the three cows.

The plaintiff testified that the morning of the day the defendant made the down payment on the farm he pinched her, twisted her arms, and kicked her out

of bed, so after breakfast she told him she was going to visit her folks, whereupon she drew $609 from the bank and went to her parents' home. Shortly after the plaintiff left, the defendant went to her parents' home and demanded that she return to him, saying he would give her two days to return to Amherst, he would take the car and that there would be no more joint accounts; that she stole the money she withdrew from the bank when she left; and she would know nothing about his business affairs. He told her they would leave the state, and that she would have to go up and work for his folks. He left and returned a few days thereafter, and they reached an agreement to live on the Devore place where she desired to live, and the place she had selected. After they settled there, the plaintiff testified that the defendant pouted all the time, and the first night he asked her for all the money and the car. He was not pleasant, but was mean. In disciplining the child, the defendant administered a whipping in such a manner that the plaintiff objected. The defendant then pushed and shoved the plaintiff into a bedroom and told her to "keep out of this." The condition of the child after the whipping, showing marks on her body, was testified to by the plaintiff's mother. The plaintiff testified she could no longer endure the defendant's nagging, that nothing suited him so she left him on March 13, 1946, that she has not lived with him since, and states she can no longer live with him successfully. The defendant is engaged in farming with his father on a partnership arrangement. The plaintiff is employed as a PBX operator, and the child is in school.

"It is impossible to lay down a general rule as to the degree of corroboration required in a divorce action as each case must be decided on its own facts and circumstances." Brown v. Brown, 146 Neb. 908, 22 N. W. 2d 148.

"There may be extreme cruelty justifying a decree

of divorce without physical injury or violence. Unjustifiable conduct on the part of husband or wife, which utterly destroys the legitimate ends and objects of matrimony, may constitute extreme cruelty." Myers v. Myers, 88 Neb. 656, 130 N. W. 254. See, also, Faris v. Faris, 107 Neb. 214, 185 N. W. 347.

It is evident from the record that the objects of matrimony have been wholly destroyed in the present case. We conclude that the trial court did not err in granting the plaintiff a divorce on the grounds of extreme cruelty, and that the corroborative evidence was sufficient to warrant such finding and judgment.

In addition to the amounts heretofore set forth, it appears that when the defendant was discharged from the Army he received $320 which included travel pay, accumulated pay, and the first $100 of his discharge bonus. He claims that $200 of this amount was deposited in the joint account of the parties. There also appears evidence that the plaintiff paid insurance premiums amounting to $52 on a policy belonging to the defendant; also that the defendant purchased a few bonds, the amount of which is not set forth, and the defendant kept them. Both the plaintiff and defendant make separate accountings as to what each had after the separation. The plaintiff, in her amended petition, prays judgment against the defendant for $1,082, money that she claims as her own not returned to her but appropriated by the defendant. Her accounting shows the defendant had $1,985 at the time they separated. From the accounting as set forth by the defendant, the plaintiff had $2,034.98 at the time they separated. He claims he had $864 at the time of the separation. It is the defendant's contention that in addition to the $2,034.98, the plaintiff has judgment for $1,200, leaving her $3,234.98 to his $864.

The record is in hopeless conflict as to the accounting made by the respective parties and the amounts each received. As heretofore appears, the evidence is in

direct conflict especially as to these items: That at the time he left for the Army, the defendant claims he gave the plaintiff $550, while the plaintiff claims he gave her $150, this evidences a difference of $400; also, that the plaintiff testified she gave the defendant $525 which he sent home from overseas, and the defendant denies she ever gave him this money. This evidences a difference of $525. We will not detail other items because we are convinced it is impossible to reconcile the testimony with reference to the accounting in the present state of the record.

"When the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite." Dier v. Dier, 141 Neb. 685, 4 N. W. 2d 731; Brown v. Brown, *supra.*

"In deciding the question of alimony or division of property as between the parties the court, in exercising its sound discretion, will consider the respective ages of the parties, their earning ability, the duration of and the conduct of each during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, whether the property was accumulated before or after the marriage, and any and all other circumstances bearing upon the question and from all of such elements determine the rights of the respective parties." Vocelka v. Vocelka, 146 Neb. 268, 19 N. W. 2d 363. See, also, Hild v. Hild, 135 Neb. 896, 284 N. W. 730.

From an analysis of the record we conclude that the judgment of the trial court on the allowance of alimony should be modified to the extent that the plaintiff have and recover of and from the defendant the sum of $600 as alimony, and costs of suit. Judgment affirmed as modified.

AFFIRMED AS MODIFIED.