FAYE SCHLUETER, APPELLEE, V. FRANK SCHLUETER, APPELLANT.

62 N. W. 2d 871

Filed February 26, 1954. Nos. 33445, 33475.

*William R. Patrick* and *Smith & Smith*, for appellant.

*Tesar & Tesar*, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

The plaintiff Faye Schlueter brought this action seeking a divorce from the defendant Frank Schlueter. Her amended petition alleged extreme cruelty and prayed for temporary alimony during the pendency of the action, permanent alimony, attorney's fees, and costs. The defendant's answer, after admitting certain facts contained in the plaintiff's amended petition, denied generally the allegations of extreme cruelty contained therein and prayed that plaintiff's action be dismissed.

Trial was had to the court on the issue as to whether or not the plaintiff was entitled to a divorce from the defendant, and on the issue as to the extent and value of the property of the parties and the permanent alimony to be awarded the plaintiff, if any. At the conclusion of the trial the trial court granted the plaintiff an absolute divorce from the defendant, made a division of the property of the parties, both real and personal, awarded the plaintiff attorney's fees as part of the costs, and required the defendant to pay the costs. A motion for a new trial

was filed on the divorce issue and another motion for a new trial was filed on the division of the property as made by the trial court, both of which were overruled, and the defendant appealed to this court.

The plaintiff testified that she became acquainted with the defendant on November 9, 1924, when he was living on an 80-acre farm owned by his father and located approximately 6 miles from Papillion. She went to work for him as a housekeeper and was to receive $30 a month as wages, and board and lodging for her 4-year-old son by a previous marriage and for her brother who at that time was 18 years of age. The defendant paid her wages for the first 2 months and then, due to the fact that the defendant desired to purchase some more cows and needed equipment for the farm, no more wages were paid. However, it was understood between the parties that when each had accumulated one thousand dollars they would be married. They were married on March 14, 1929, in Sarpy County. No children were born to this union.

The plaintiff's son resided with the parties and was cared for and went to school through the eighth grade. When he was 18 years of age, in 1938, he left the farm to visit his father in Nevada. He returned after about 4 months, worked 4 or 5 months for a party in Papillion, and entered the military service of the United States from which he was discharged about 6 years later. While he resided on the farm of the defendant he did chores and other work incident and necessary to farm work.

At the request of the plaintiff, the defendant went to Omaha and brought the plaintiff's brother out to the farm in August 1924, where he made his home and was provided for. He remained on the farm until he left on a trip to California in 1952. He had trouble with his feet and had undergone surgical operations and medical treatment to enable him to walk better. The defendant, for a period of about a year, massaged his

legs to help him in this respect. 'The plaintiff's brother worked in the fields for the most part, using farm implements upon which he could ride. He was considered a good farm hand and worker, and his relationship with the defendant was good.

The difficulty between the parties seems to have started in 1938, when the defendant was a candidate for sheriff of Sarpy County and was unsuccessful. Thereafter the defendant became sullen and would not speak to the plaintiff or the neighbors for weeks at a time. He would also go away from home and remain for long periods of time. He drank to excess and on many occasions would come home in an intoxicated condition and go to bed with his clothes on, and would urinate in various places in the home in the presence of persons who were visiting there. The plaintiff requested the defendant to sleep in the bunkhouse where her brother and her son slept. He did not object to this, and did so for a period of 2 or 3 years.

The plaintiff kept track of the bills to be paid, and on numerous occasions she would ask the defendant for money to pay the bills. He would tell her that he had no money, when she knew that he had considerable money which he received from the sale of farm products or from his father's estate. He either carried this money on his person or placed it in a cupboard. She estimated the amount of the inheritance to be approximately $5,000. He testified that he desired to keep the inheritance separate from the farm money.

The defendant called the plaintiff vulgar and indecent names. He would fly into a rage over the payment of bills, pound the table, and exhibit a violent temper. This appears to have been more pronounced from and after 1945. On one occasion the defendant, when he was mad, threw a cup at the plaintiff and missed her. Another time he struck her across the face with his open hand, mashed her nose, and cut her lip open. She bled from the blow. On another occasion he pushed her against

the door when they were having difficulty over the payment of bills. On another occasion, when the plaintiff was injured by being bumped by a hog, the defendant locked the automobile so she could not use it. However, she subsequently did use it to go to a doctor. The defendant neglected repairs around the house and premises, and had no pride in his home. The plaintiff was unsuccessful in her attempts to comfort him.

The defendant never discussed his financial affairs with the plaintiff or cooperated with her over the period of their married life to enable her to keep proper accounts of the farm products or the stock or grain sold by him. On many occasions he failed to deposit in the bank the money received from such sources and the plaintiff was required to call the bank to ascertain if there was any money upon which she could draw to pay the bills. On one occasion there was $590 in the bank and a few days thereafter a $12.50 check was returned to her because of insufficient funds.

There is evidence that the defendant drank intoxicating liquor on occasions, however, the evidence with respect to the use of intoxicating liquor by the defendant is not such that it could be concluded that he was a drunkard.

The plaintiff belonged to different ladies' societies and would request the defendant to take her to the meetings. He would, on occasions, leave her there and let her get home the best way she could by coming home with neighbors or other parties.

There is also evidence that the plaintiff had indulged in playing bingo to some considerable extent. She testified that by the sale of farm products she bought from others and resold, the defendant was not out of pocket in such respect.

The plaintiff's brother corroborated her testimony to the effect that the defendant on many occasions called the plaintiff vulgar names, came home in an intoxicated condition, and went to bed with his clothes on; that the

defendant would stay away from the home for a period of time; and that there was always an argument between the parties over the payment of bills. He also testified that the defendant would double up his fists, swear, and make threatening gestures toward the plaintiff; and that he saw the plaintiff, after the defendant had struck her across the face, in bed endeavoring to keep her mouth from bleeding, and her face was swollen the next day before she went to the doctor. He further testified that he was present when the defendant threw a cup at the plaintiff and missed her. The defendant was mad on any occasion when the plaintiff requested money from him to pay bills.

The plaintiff's son testified to arguments between the plaintiff and defendant with reference to bills that had to be paid. The defendant would declare that he had no money, when in fact he had money in his pocket to pay the bills.

A hired man who worked occasionally for the defendant testified that he observed that the defendant would not speak to the plaintiff for long periods of time; that the defendant refused to make repairs around the home; and that whenever bills were mentioned an argument ensued and the defendant declared he had no money with which to pay bills.

The plaintiff's sister testified that when she visited the home of the parties there was always tension created by the defendant, and the defendant would refuse to give the plaintiff money even for the necessities of life. This money had to come from other sources, principally from farm products such as chickens, eggs, and cream sold by the plaintiff. This witness furnished money to the plaintiff to buy chickens and fix up things around the house. The defendant refused to give the plaintiff money on many occasions.

For the most part, the defendant's testimony denied any extreme cruelty on his part. He testified that the plaintiff always referred to him in vulgar and bad lan-

guage; that he never used such language toward her; that she had access to the banking account; and that at times he was short of money and could not pay his bills, but that the bills were eventually paid.

A former schoolmate of the plaintiff who had known her for 40 years testified that plaintiff always referred to the defendant in an uncomplimentary and vulgar manner; that plaintiff stated she was going to send him "down the road without a shirt on his back when she got through with this"; and that the defendant would listen to the plaintiff's arguments about money, would make a few gestures, and leave. This witness and her husband were friends of the parties and visited in their home, and the visits were returned on occasions.

A person who worked for the defendant on the farm testified that he heard the plaintiff call the defendant vulgar names.

A friend of both of the parties was contacted by the plaintiff with reference to interceding in the difficulties between the parties in February or March 1953. The plaintiff did not mention anything in connection with the domestic difficulties had between the parties, but desired this witness to contact the defendant to effect a reconciliation. This witness did contact the defendant without success.

The defendant testified that he did not think he could resume the marriage relation with the plaintiff, or that they could live as a happily married couple. He told the friend who contacted him for the purpose of effecting a reconciliation that there was no possibility of doing so.

Divorce cases are tried de novo on appeal to this court, subject to the rule that when credible evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite.

See, Killip v. Killip, 156 Neb. 573, 57 N. W. 2d 147; Wakefield v. Wakefield, 157 Neb. 611, 61 N. W. 2d 208.

In an action for divorce if the evidence is principally oral and is in irreconcilable conflict, and the determination of the issues depends upon the reliability of the respective witnesses, the conclusion as to such reliability will be carefully regarded by this court on review. See, Hodges v. Hodges, 154 Neb. 178, 47 N. W. 2d 361; Stefan v. Stefan, 152 Neb. 23, 39 N. W. 2d 918; Trevett v. Trevett, 151 Neb. 517, 38 N. W. 2d 332.

It is impossible to lay down any general rule as to the degree of corroboration required in a divorce action, as each case must be decided on its own facts and circumstances. See, Brown v. Brown, 146 Neb. 908, 22 N. W. 2d 148; Green v. Green, 148 Neb. 19, 26 N. W. 2d 299; Johnsen v. Johnsen, 144 Neb. 208, 12 N. W. 2d 837; Wakefield v. Wakefield, *supra.*

Extreme cruelty may consist of personal injury or physical violence, or it may be acts or omissions of such character as to destroy the peace of mind or impair the bodily or mental health of the person upon whom they are inflicted or toward whom they are directed, or be such as to destroy the objects of matrimony. See, Messer v. Messer, 157 Neb. 312, 59 N. W. 2d 395; Wakefield v. Wakefield, *supra;* Green v. Green, *supra;* Roberts v. Roberts, 157 Neb. 163, 59 N. W. 2d 175; Oertle v. Oertle, 146 Neb. 746, 21 N. W. 2d 447; Ellison v. Ellison, 65 Neb. 412, 91 N. W. 403; McNamara v. McNamara, 93 Neb. 190, 139 N. W. 1045; Kroger v. Kroger, 153 Neb. 265, 44 N. W. 2d 475.

Considering the foregoing authorities and the evidence adduced at the trial, we conclude that there was sufficient corroboration of the plaintiff's testimony to warrant the trial court in granting her a decree of divorce from the defendant on the grounds of extreme cruelty.

The record discloses that the home place, upon which the parties lived, is described as the Northeast quarter of the Northwest quarter, and the Northwest quarter of

the Northeast quarter of Section 13, Township 13, Range 12 East of the 6th P. M., in Sarpy County, Nebraska. The Clarke 80 acres is described as the South half of the Southwest quarter of Section 12, Township 13, Range 12 East of the 6th P. M., in Sarpy County, Nebraska. The Leaders 40 acres is described as the Southwest quarter of the Southeast quarter of Section 12, Township 13, Range 12 East of the 6th P. M., in Sarpy County, Nebraska.

It appears that the first described land was deeded to the defendant by his father on March 4, 1935. The defendant assumed a mortgage of $2,000 on this land, which was paid off, and the title thereto remained in the defendant. After the marriage, the Clarke land heretofore described was purchased for $12,000, with a $2,000 down payment, a mortgage of $10,000 was assumed by the defendant and subsequently paid off, and title thereto was taken in the name of the defendant. The Leaders land above described was purchased for $6,500 in May 1946, and paid off in the same year by the sale of crops from the defendant's lands. The title to this land was taken in the name of both parties as tenants in common.

The house on the home place is small, consisting of a large front room, a small bedroom, and a kitchen. During the marriage of the parties considerable improvements were made on the farm such as a new dairy barn, milkhouse, chicken house, and bunkhouse. Modern machinery and other modern farm equipment was purchased.

The record further discloses that on March 15, 1952, the parties borrowed $10,000 from the Prudential Life Insurance Company. This amount was deposited in the Live Stock National Bank of Omaha. From this amount $2,580 was withdrawn for the purchase of dairy cattle, $89.90 for attorney's fees and costs in the separate maintenance suit brought by the plaintiff against the defendant in 1951 which was dismissed, and for abstracts, and $445.25 to pay a judgment obtained against

the plaintiff on two promissory notes she gave to a bank to be used to pay debts that accumulated and which the defendant refused to give her money to pay. There remained on deposit from this loan $6,884.85. On May 19, 1952, the plaintiff withdrew from the foregoing account $5,000 which she deposited in another bank in her name. On May 5, 1953, the plaintiff had a balance in the bank in her name in the amount of $2,131.01. The defendant had a balance of $496.81 in a bank in his name on April 21, 1953.

An inventory of the property, both real and personal, of the defendant was made by three disinterested appraisers during the trial. They fixed the gross amount of such property at $42,571. The property consisted of an automobile and trucks of the value of $2,000; farm machinery, including a side-delivery rake of the value of $285 which was not paid for, of the value of $2,203; livestock of the value of $4,438; and 400 bushels of corn valued at $560. The buildings on the home 80 acres were valued at $7,170. The 80 acres known as the home place was valued at $10,000, the Clarke 80 acres at $11,200, and the Leader 40 acres at $5,000.

The trial court, in its decree, adjudged the plaintiff should have as her sole property the 80 acres known as the Clarke farm, free and clear of all encumbrances. In addition, she was to have $2,600 in cash to be paid by the defendant within 90 days from the date of the signing of the decree. It was further adjudged that she was entitled to keep the balance of the $5,000 withdrawn by her from the $10,000 loan as above mentioned, and to retain all personal effects in her possession or in the possession of the defendant; and she also was awarded the landlord's share of two-fifths of the 1953 crop planted on the Clarke 80 acres of land which was awarded to her. The defendant was awarded the balance of the real estate and tangible personal property of the parties including livestock, farm equipment, corn in the crib, the balance of cash in his personal checking ac-

count, and all other chattel property in his possession, except personal effects of the plaintiff. The defendant was ordered and directed to assume and pay the principal and interest on the $10,000 loan secured by a mortgage held by the Prudential Life Insurance Company covering all the real estate involved in this action, and to remove any encumbrances on the land here involved decreed to the plaintiff by a quitclaim deed, which appears in the record. In addition, the defendant was ordered to pay attorney's fees taxed as part of the costs in the amount of $1,500, and the costs.

The court in deciding the amount of alimony or in making a division of property in a divorce case will consider the age of the parties, their earning ability, the duration of and the conduct of each during the marriage, their station in life, the circumstances and necessities of each, the physical condition of each, the property owned by them and whether or not it was acquired by their joint efforts, and any other pertinent facts. See, Messer v. Messer, *supra;* Killip v. Killip, *supra.*

At the time of trial, the plaintiff was about 55 years of age, the defendant was 54 years of age, and their marriage had endured for a period of 24 years. The defendant appears to be in good health and able to carry on his duties as a farmer. The plaintiff had a gall bladder operation in 1950, has high blood pressure, and is required to keep her leg bandaged and can be on her feet for only short periods of time. Her health is not that of a robust person.

The rule above stated does not permit a mathematical certainty in arriving at the answer as to alimony or a division of property. See Messer v. Messer, *supra.*

The property here involved, for the most part, was accumulated by the joint efforts of the parties. The defendant inherited an equity in the 80 acres of land referred to as the home place, subject to a $2,000 mortgage that was subsequently paid off. As we view the record, the plaintiff performed the necessary duties and

met the requirements of a farm wife, and the defendant carried on his duties with the assistance of the plaintiff's brother and her son in farming the land, and he was considered a good, average farmer.

Considering all the matters shown in the evidence, we have concluded that the division of property and the award of alimony made by the trial court is excessive. The decree of the district court should be, and is hereby, modified as follows: The plaintiff is to be entitled to keep the balance of the $5,000 withdrawn by her from the Live Stock National Bank; the plaintiff is to receive permanent alimony in the sum of $9,000, to be paid by the defendant in semiannual installments of $750 on May 1, 1954, and on December 1, 1954, and the same amounts to be paid on the same dates in the succeeding years which would necessitate the last installment of $750 to be paid on December 1, 1959; and the defendant is to have the privilege of paying the amount awarded as permanent alimony on or before the final date of the last payment to be made as heretofore designated. The plaintiff is to retain the personal property awarded to her by the decree of the district court. The defendant is to have the title to the 200 acres of land herein described and to assume and pay the $10,000 mortgage thereon, the interest due or to be paid thereon, and to pay the insurance and taxes due or to become due. In addition, the defendant is to pay the outstanding $1,500 lumber bill to the Harberg Lumber Company, the $285 due for the side-delivery rake, and $1,500 attorney's fees allowed by the trial court as costs to the plaintiff for the benefit of her counsel. The defendant is also to be awarded the 1953 crop raised on the 80 acres of land originally awarded to the plaintiff, or in the event this land is farmed by a tenant, then the landlord's share of such crop, and the personal property as awarded in the decree of the district court.

The defendant contends that after the notice of appeal had been filed on June 10, 1953, and the docket fee

of $20 paid, the appeal had been perfected and jurisdiction was thereby lodged in the Supreme Court in accordance with section 25-1912, R. R. S. 1943.

On July 3, 1953, the trial court allowed the plaintiff $100 a month temporary alimony and $75 suit money, by continuing its former order for temporary allowances entered June 25, 1952. The defendant, in his first notice of appeal, gave notice of appeal from each and all of the rulings, judgments, decrees, and orders of the trial court. A supersedeas bond was given. Following the overruling of the defendant's motion for a new trial as to the order entered by the trial court on July 3, 1953, as above mentioned, the defendant filed a second notice of appeal and gave a supersedeas bond. Therefore, the order of July 3, 1953, entered by the trial court is void for lack of jurisdiction in the district court to enter such order.

We conclude, from an examination of the record, that the defendant has complied with section 25-1912, R. R. S. 1943, and by doing so has properly perfected appeal to this court, vesting this court with jurisdiction of the entire matter. See, Ash v. City of Omaha, 152 Neb. 699, 42 N. W. 2d 648; Madison County v. Crippen, 143 Neb. 474, 10 N. W. 2d 260; Moritz v. State Railway Commission, 147 Neb. 400, 23 N. W. 2d 545; Thesing v. Westergren, 75 Neb. 387, 106 N. W. 438; Fisher v. Keeler, 142 Neb. 79, 5 N. W. 2d 143.

We recognize that in some jurisdictions an award of temporary alimony during the pendency of the appeal in the Supreme Court of the state has been approved. However, under the authority above cited and in the light of our statute, we determine otherwise, and the plaintiff's contention in such respect is without merit.

It might also be noted that the record discloses that the plaintiff had received $900 temporary alimony during the pendency of the action in the district court and, in addition, at the time of trial she apparently had at least $2,000 in cash.

For the reasons given in this opinion, the judgment of the district court is affirmed in part and in part reversed, and the cause is remanded to the trial court with directions to enter a decree in accordance with this opinion. Costs are taxed to defendant.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED WITH DIRECTIONS.