ANSON H. BIGELOW, APPELLEE, V. HARRIET PEARL BIGELOW, APPELLANT.

FILED JUNE 5, 1936. No. 29574.

. *R. B. Hasselquist* and *D. S. Krause,* for appellant.

*O'Sullivan & Southard* and *O'Brien & Powers, contra.*

Heard before GOOD, PAINE and CARTER, JJ., and CLEMENTS and THOMSEN, District Judges.

PAINE, J.

Anson H. Bigelow, plaintiff and appellee, filed an amended and supplemental petition for divorce in the district court for Douglas county, charging that the defendant had been guilty of extreme cruelty and adultery, and asking that an accounting be had of the property interests of both parties and an equitable division made.

To this an amended answer and cross-petition was filed by Harriet Pearl Bigelow, his wife, the defendant and appellant, absolutely denying all of the charges made by him, and in her cross-petition alleging that the plaintiff had been guilty of extreme cruelty toward her, and charging him with committing· acts of adultery in the state of Iowa and in the state of Nebraska; alleging that she had at all times been a dutiful, obedient, and chaste wife, and asking that an accounting be had of their property rights,

and that she be granted an absolute divorce, with attorney fees, together with support and maintenance for the remainder of her life.

A trial was had, lasting many days, and the bill of exceptions is contained in three large volumes. On April 1, 1935, an eight-page decree was entered by the trial court, finding that the parties have resided in Douglas county since their marriage, and that there are no children born of the marriage. The petition of the plaintiff is dismissed. A decree of absolute divorce is granted to the defendant on her cross-petition upon the ground of adultery. The decree found that the market value of the plaintiff's property was between $30,000 and $35,000, and awarded to the defendant $7,500, to be paid at the rate of $75 a month for the first two years, and thereafter at the rate of $100 a month until fully paid, and gave the defendant a lien on the plaintiff's share of the proceeds of the sale of certain interests in a mausoleum handled by a trustee; awarded to the defendant "the household furniture and contents, except the library, purely personal belongings, clothing and other paraphernalia of the plaintiff;" allowed the defendant $125 temporary alimony and $750 attorney fees, and made provision *in re* title to various pieces of property.

Each of the parties immediately filed motion for new trial, and on April 15, 1935, the trial judge filed a memorandum opinion, in which he exhaustively discussed the allegations, charges, complaints, the evidence in support of each, and the evidence in opposition thereto, and overruled each of the motions for a new trial, and upon the same day notice of appeal to this court was given by the defendant, and briefs were duly filed, and the case argued at length and submitted.

There is no question in the minds of the court but that the trial judge was right in finding that the charge of adultery made by plaintiff had not been proved. On the other hand, the charges of adultery made in the cross-petition of the wife were fully sustained by the evidence.

This appeal relates to the property rights of each party, alimony, and attorney fees.

The plaintiff, who was 67 years old at the time of the trial, had been a superintendent of public schools as a young man at several places, among them Greeley, Minden, and Falls City, Nebraska, Le Mars, Iowa, and seven years in Lead, South Dakota. He graduated from Creighton University Law School in 1912, since which time he has practiced his profession in Omaha. The defendant was a widow with three young children at the time of her marriage to the plaintiff, and was 54 years of age at the time of the trial.

The plaintiff testifies that he first met the defendant about 1909, and she testifies that they met in 1910 at Presho, South Dakota, where he was lecturing before a teachers' institute. She then took a stenographic course in Denver, and obtained stenographic work in Omaha through the assistance of the plaintiff. She obtained a divorce from her first husband, Mr. Agnew, but he was not paying the alimony and support money, and the plaintiff endeavored to assist, through an attorney in South Dakota, in collecting money from Mr. Agnew, who had remarried.

The plaintiff's second wife was killed in the Omaha tornado March 23, 1913, leaving him with two children; one, who had married, was by his first wife, and a daughter, Lucille, by his second wife, remained with her father and graduated that same year from the Omaha high school. The plaintiff and defendant were married on February 22, 1914, at Mankato, Minnesota, but it was not publicly announced until August of that year, when they began living together, at which time the defendant's three children were brought to Omaha; they having remained with her divorced husband on a farm in South Dakota up to that time. The three children were Portia, who was at that time eleven years of age, Ilma, nine, and Thomas, seven. At the time of the marriage the plaintiff had a small amount of equipment for a law office, and was in

debt around $5,000 to his brother-in-law, which debt was later forgiven. The defendant after her marriage worked as stenographer and clerk in the plaintiff's law office for something over a year, and at various times thereafter assisted in the clerical work of the office temporarily. The plaintiff rapidly built up a lucrative law business, and claims to have expended on his wife and her children from $5,000 to $7,000 a year for many years, and in some years, he claims, his personal and living expenses were as much as $9,000, which is denied by the defendant. Her oldest daughter graduated from the Central High School, then attended the University of Wisconsin, and then the Randolph Macon Women's College in Roanoke, Virginia, and then went to New York City and took special dancing lessons, and then was married and came to Omaha with her husband; lived in an apartment until a baby was born, and this grandchild lived with the plaintiff and defendant in their home until it was nearly six years of age. Portia got employment on the stage, was divorced from her husband, and then remarried. The second daughter, Ilma, and son, Tom, graduated from the Central High School and then were sent to various other schools, all at the expense of the plaintiff. The plaintiff treated the three children of the defendant as his own, and spent large sums of money on their support and education, treating them with the same liberality as he did his own children. Exhibit 123 is an itemized property statement, given by the plaintiff to the Omaha National Bank, showing his net worth to be $178,157.04 on May 21, 1930.

Something over ten years after their marriage, serious difficulties first began to arise over money matters, and the defendant complained that he was giving his younger daughter too much money. The defendant then began going to the plaintiff's office in his absence, examining the records and books in an endeavor to ascertain the sources of his income and the full amount thereof, and in going through his files discovered letters from women

clients and friends, some of which were couched in endearing terms, and which the defendant abstracted from his files, and a large number of such exhibits she introduced in evidence.

The principal contention of the defendant in this court is that the decree of the trial court deprived her of a one-tenth interest in the valuable mausoleum property, which had been hers for a period of approximately ten years, and required her to reconvey the Sioux county land, to which she had also held title for a number of years. It is insisted by defendant that the trial court was without jurisdiction to divest her of her fee simple title to her interest in this real estate. In addition, the defendant charges that during 14 months last past plaintiff has contributed but $3.84 a month to the support of the defendant, and it is asked that the court modify the decree so as to adequately support and maintain the appellant, and reinvest her with her title to her interest in the mausoleum property.

In regard to the Sioux county land, the plaintiff contends that this 160 acres was conveyed by plaintiff to Mrs. Bigelow on November 29, 1922 (exhibit No. 63), for the sole purpose of inducing her to sign an additional mortgage of $1,000 upon the home to raise $1,000 which was absolutely necessary in his business just at that time to complete the foreclosure of the mausoleum property, and plaintiff alleges that she had promised to reconvey it as soon as the mortgage on the home was reasonably reduced, and the decree required this to be done. This appears to be supported by the evidence.

The sharpest dispute in regard to the property rights is in reference to the West Lawn Mausoleum Association property. This was a tax-free, nonprofit organization, organized under the law now found in section 13-601 to section 13-605, inclusive, Comp. St. 1929, created to manage the property. The West Lawn Mausoleum was built in West Lawn Cemetery, Omaha, by the Colorado Yule Marble Company, with marble from its own quarries at

Yule, Colorado. The project was first promoted by the late Thomas H. Matters, and suit was brought for alleged secret profits, and the original project is discussed at length in the case of *Nebraska Mausoleum Co. v. Matters,* 108 Neb. 618, 188 N. W. 231. The plaintiff in the case at bar became attorney for the Nebraska Mausoleum Company in 1914 in litigation seeking to force the Colorado Yule Marble Company to complete the building, construction having stopped midway because of lack of capital. The Colorado Yule Marble Company went into receivership, and the federal court at Denver endeavored to commandeer funds due it, and threatened to take over the mausoleum. Litigation also arose over the bonds that had been issued by the Nebraska company, and the litigation continued for some eight years. Between 1919 and 1921 the plaintiff and Dr. John W. Koutsky on behalf of his wife, Julia, who had furnished funds to buy up the bonds and the land, foreclosed the property, and the title was taken in Mr. Bigelow's name, with Mrs. Koutsky and one other as undisclosed principals. In 1929 Mr. Bigelow succeeded in quieting his title against the Colorado Yule Marble Company in bankruptcy proceedings in Denver. The third owner was now bought out, leaving the title in Mr. Bigelow's name as record owner, but he only owned a one-half interest, and Julia Koutsky the other half. This West Lawn Mausoleum contained 650 tombs, some arranged to be sold singly, others in groups of several tombs, and others as memorial rooms for family use, containing five, ten, or fifteen tombs. There are also 60 niches, each with a capacity of five urns for the ashes of cremated bodies. Some of these tombs and niches are priced at from $450 to $1,200 each, with private rooms higher.

The bill of exceptions discloses that Carl K. Linge, of Cedar Rapids, Iowa, was called as an expert in mausoleums. He owns controlling interests in cemeteries at various places, and spends his time looking after cemetery investments in Council Bluffs, Omaha, Lincoln, and Cedar

Rapids, Iowa. He was the owner of a large mausoleum built at Topeka, Kansas, but had disposed of his interests. Mr. Linge is a director of the National Cemetery Owners' Association, and the year before, he testified, he had taken a trip of 10,000 miles through the east, visiting many cemeteries and mausoleums. He was asked the value of the remaining 506 tombs and some 56 niches, and said that he would be willing to pay $25,000 for the unsold space. On cross-examination he said that the unsold space at full regular listed prices for tombs, niches, and family memorial rooms would amount to $399,000.

It is shown by the evidence that the customary method of building such large marble mausoleums is to have the company organized and then sell in advance a sufficient number of the tombs and memorial rooms, lined with crypts for caskets, to pay the cost of the building, and then, as additional sales are made, money is set aside in an endowment fund to care for the building perpetually, and that, in the case of the West Lawn Mausoleum Association, because of the litigation, no such funds were set aside for endowment for permanent maintenance, and, therefore, it was more difficult to sell tombs therein. Therefore, a contract had been entered into between Anson H. Bigelow, West Lawn Mausoleum Association, and the Omaha National Bank, by Daniel J. Monen, its trust officer, together with a trust agreement and sales contract, the same being exhibits 19 and 20, consisting of 23 pages, to set aside certain sums out of each sale for a perpetual care fund for tombs, and the owners will receive but 28.75 per cent. of the proceeds until the back endowment funds are replaced, and thereafter will receive 33.5 per cent.; so it is claimed by plaintiff that in no event will plaintiff's share of the proceeds of the future sales amount to more than $16\frac{3}{4}$ per cent. of the sales, and the court found that the reasonable present value of Mr. Bigelow's property ownership in the mausoleum was between $30,000 and $35,000. The trial court found that the gross sales of tombs during the last 19 years have amounted to

about $3,500 a year. The plaintiff's attorneys insist that they do not dispute the value placed by the decree of the trial court upon any property listed in the final decree except the mausoleum property, and insist that their client's share of this mausoleum is actually worth $12,500, instead of the value fixed by the court. In our opinion, the value is, if anything, slightly greater than that placed upon it by the trial court.

Exhibit No. 39 is a warranty deed by the plaintiff to the defendant, "in consideration of one dollar and other goods and chattels," to a one-tenth interest in a tract of ground 100 feet by 150 feet, together with the building thereon known as the West Lawn Mausoleum. It was acknowledged before J. F. Micek, a notary public, on the same day, and was recorded in the office of the register of deeds on April 13, 1933. In this deed the defendant's first name is misspelled by writing it "Harriette" three times. The plaintiff insists that this warranty deed, so far as conveying title to a one-tenth interest in the mausoleum to the defendant, was fraudulent. The title of the mausoleum at that time was in the plaintiff, and he testified that he drew up and signed this deed, exhibit 39, but the name of the defendant as grantee was not written in, nor was the particular fractional portion of ownership of the mausoleum inserted, nor was any consideration written in, and that, while he signed it, he did not acknowledge it before a notary; that his purpose in preparing the deed was to transfer to Mrs. Julia Koutsky her undisclosed ownership in the mausoleum; that the deed so signed by him was lost, and he testified that both he and his stenographer hunted for it in the office for a couple of months, but never could find it; that he never heard of the lost deed, or that the defendant was claiming a one-tenth interest in the mausoleum property, until on May 23, 1933, when she so stated in a letter (exhibit No. 22) to the president, officers, trustees, and members at a meeting of the board of directors.

Now, in direct conflict therewith, the defendant testifies

that the plaintiff had been carrying a $5,000 life policy payable to her, and that in 1925, without her knowledge, he had taken out the cash value in a loan on the policy, and that the plaintiff gave her this warranty deed, exhibit 39, because of his borrowing the full value of this life insurance policy; that she was present at the time it was written, and that his stenographer filled in the entire deed on the typewriter, just as it appears now, spelling her name wrong, and that the plaintiff then took the deed and she went with him to Mr. Micek, a notary public, whose office was on the same floor, and she was present when he acknowledged the deed, and she saw the notary sign it and attach his seal, and the deed was delivered to her at that time and place, but that she did not record it until April 13, 1933, after the plaintiff had threatened to take everything away from her.

There appear in evidence two exhibits which are photographs, greatly enlarging the paragraphs of the deed, exhibit 39, showing the name of the grantee, the consideration, and the one-tenth interest, and this court has carefully examined these exhibits and reaches the same conclusion that the trial court did in its first decree, that the exhibits clearly support the evidence of the defendant, and we therefore adopt the defendant's explanation of the execution and delivery of the deed, and we believe that she is clearly entitled in equity to a one-tenth net interest of that portion of the mausoleum property owned by the plaintiff.

The memorandum for decree of the trial court calls attention to the fact that the plaintiff and defendant on July 28, 1930, executed a warranty deed to the West Lawn Mausoleum Association, which deed was acknowledged before James H. Hanley, notary public, on August 2, 1930, and left in escrow with the Omaha National Bank as trustee, by which deed the parties conveyed the legal title to the land in question, subject to the conditional sale and trust agreement to the West Lawn Mausoleum Association, and further reserving therefrom many tombs

and niches which had theretofore been sold, and reserving in favor of the grantors rows 1, 2, 3, 4, and 5 of section 33 as a family section in said mausoleum, and the proceeds to be distributed by the trustee in accordance with the trust agreement and sales contract. The trial court found in its decree that this transaction converted the interests of the plaintiff and the defendant in the mausoleum property into personalty, and reserved to them only a right to share in the proceeds of the sales of tombs and niches, in accordance with the trust agreement, and that the trial court had the power thus to divide the property of the parties equitably between them.

It is insisted by the defendant's attorney that the plaintiff is at this time worth $120,000, and that the one-tenth interest in the mausoleum should be restored to her, as conveyed to her by the deed from her husband.

The testimony of the trust officer of the Omaha National Bank, supported by that of others, is that the defendant has delayed important business matters by refusing to sign deeds and other instruments except upon her terms and at her pleasure, and we find that to restore to her a title to a one-tenth interest in the mausoleum property, as demanded by her, might hinder the prompt sale and conveyance of tombs therein. Therefore, under the circumstances, the escrow deed and arrangement with the Omaha National Bank, trustee, appears to be the best plan which could be devised for efficiently handling this mausoleum property, and the decree in that regard should not be disturbed.

The defendant insists that this is, in effect, dividing the real estate between them, and insists that the court has no jurisdiction to divide real estate in a divorce proceeding, citing *Cizek v. Cizek,* 69 Neb. 800, 99 N. W. 28. However, this decision, rendered in 1904, was before the legislature enacted section 42-321, Comp. St. 1929, upon that subject. In *Maxwell v. Maxwell* (1921) 106 Neb. 689, 184 N. W. 227, it was held that a court could award an innocent wife a husband's interest in a remainder. The

next year, in *Bartunek v. Bartunek,* 109 Neb. 437, 191 N. W. 671, this court held that real estate could be equitably divided between the parties. See, also, *Myers v. Myers,* 88 Neb. 656, 130 N. W. 254; *Bristol v. Bristol,* 107 Neb. 321, 185 N. W. 972.

The trial court had the legal right to assign the property, both real and personal, acquired during the marriage by the joint efforts of the parties, between the parties as equity required upon the granting of an absolute divorce.

From a careful examination of the evidence, we are of the opinion that the one-tenth interest of the defendant in the mausoleum is worth, at the very least, $3,500, instead of the $2,500 value placed upon it by the trial court.

In section 33 of the mausoleum certain family tombs are reserved to the owners, and within one of these tombs lies the body of the defendant's only son. The title to this tomb containing the body of her son should be set apart to her, so that she shall have the exclusive title thereto.

The decree should be modified in these two respects: First, to provide that the payments continue to the defendant until an additional $1,000 is paid to her at the rate of $100 a month for ten months; and, second, that the defendant shall have sole ownership of the tomb in which the body of her son was placed.

As thus modified, the decree of the trial court is affirmed. Defendant is allowed $200 attorney fees in this court, to be taxed as part of the costs.

AFFIRMED AS MODIFIED.