DOLORES LUCILLE WORKMAN, APPELLANT, V. FRANK
MUNROE WORKMAN, APPELLEE.
83 N. W. 2d 368

Filed May 24, 1957. No. 34057.

*Crosby, Pansing & Guenzel* and *Perry, Perry & Nuern-berger,* for appellant.

*Max Kier,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action for divorce brought by Dolores Lucille Workman as plaintiff in the district court for Lancaster County against Frank Munroe Workman, defendant. The defendant filed a cross-petition praying for a divorce. The trial court dismissed the plaintiff's petition and the defendant's cross-petition, denying a divorce to both parties. The plaintiff and defendant both filed motions to vacate the judgment of the district court. Both of these motions were overruled. From the order overruling the plaintiff's motion to vacate the judgment, the plaintiff appeals.

The plaintiff's petition charged the defendant with extreme cruelty toward her. She asked for custody of the minor children, child support, alimony, and a division of the property acquired by the parties during their marriage. In addition, the plaintiff alleged the formation of corporations and the creation of certain trusts by the defendant and other business matters conducted by him with the purpose of defrauding the plaintiff of any rights she might have in the property of the parties.

The defendant filed a cross-petition in which he charged the plaintiff with extreme cruelty; admitted the formation of corporations and trusts as alleged in the plaintiff's petition; denied any fraud in connection therewith; and prayed for a divorce.

The plaintiff, by reply to the answer and answer to the defendant's cross-petition, denied the allegations of extreme cruelty contained therein and all other affirmative matter alleged by the defendant with reference to the formation of the corporations and creation of the trusts.

In an appeal to this court in a divorce action the cause is tried de novo. Messer v. Messer, 157 Neb. 312, 59 N. W. 2d 395.

We deem the following to be applicable to this appeal.

Any unjustifiable conduct on the part of either the husband or wife, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the bodily health and endanger the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes "extreme cruelty" as defined in section 42-302, R. R. S. 1943. See, Smith v. Smith, 160 Neb. 120, 69 N. W. 2d 321; Egbert v. Egbert, 149 Neb. 227, 30 N. W. 2d 669.

Extreme cruelty may consist of personal injury or physical violence, or it may be acts or omissions of such character as to destroy the peace of mind or impair the bodily or mental health of the one upon whom they are inflicted or toward whom they are directed, or be such as to destroy the objects of matrimony. See Messer v. Messer, *supra.*

A decree of divorce cannot be granted solely on the declarations, confessions, or admissions of the parties. There must be corroborative evidence of the facts necessary to be established as required by section 42-335, R. R. S. 1943. See, Hines v. Hines, 157 Neb. 20, 58 N. W. 2d 505; Smith v. Smith, *supra.*

It is impossible to lay down any general rule as to the degree of corroboration required in a divorce action, as each case must be decided on its own facts and circumstances. See, Schlueter v. Schlueter, 158 Neb. 233, 62 N. W. 2d 871. See, also, Hines v. Hines, *supra.*

The bill of exceptions in this case is voluminous. It would serve no useful purpose to detail the evidence of the respective witnesses.

For convenience we will refer to the parties as designated in the district court.

The record discloses that the parties were married at

Washington, Kansas, on April 20, 1937. At the time of their marriage they were each 29 years of age, and at the time of trial they were each 48 years of age. The plaintiff had been previously married. Her first husband died about February 13, 1937. The defendant had been married twice prior to this marriage to the plaintiff, and was divorced on each occasion. Five children were born to this marriage: Dellouise Workman, born December 19, 1937, and now self-supporting; Joseph Workman, born June 8, 1942; Robert Workman, born June 17, 1943; William Workman, born April 28, 1944, now deceased; and Francine Workman, born March 20, 1947.

The plaintiff came to Nebraska about 1935 or 1936, and was employed as a supervisor of a branch house of a corporation located in this city. The defendant at that time was employed by the telephone company. The defendant engaged in the business of leasing furniture and equipment in certain buildings for the purpose of renting the same to tenants. Prior to their marriage, the defendant would take the plaintiff with him on occasions to look over properties with the idea of purchasing them. After their marriage, by lease and purchase on contract, the defendant procured several properties. The plaintiff helped to plan the alterations in certain of the properties to make more rental apartments, increased the rents, and worked to make the apartments more attractive by painting and hanging wallpaper, scrubbing, varnishing the woodwork, making curtains, and doing other work necessary to induce tenants to rent. She contacted tenants, assisted in the collection of rents, and took complaints over the telephone made by tenants. She did this type of work for a period of about 12 years, or until the office was moved to a downtown location.

It appears that the parties, from the time of their marriage, lived at various locations in properties acquired for business purposes, and finally moved into a house at 940 South Cotner Boulevard to make their

permanent residence. This was sometime in January 1948. Up to 1949, according to the plaintiff's testimony, they were happily married.

The plaintiff, due to the course of conduct on the part of the defendant which she claims constituted extreme cruelty, filed an application in the district court for separate maintenance on September 5, 1953, which she subsequently dismissed. The reason for the dismissal, according to her testimony, was that she effected a reconciliation. As part of the reconciliation there was an amendment made to a revocable trust on February 12, 1954, which the plaintiff signed in June 1954. This amendment gave the plaintiff some advantages that she did not have under the trust previously. In addition, there were certain promises made by the defendant that he would remain at home nights except on occasions during the week when business matters required his absence, and that the parties would unite in their efforts to create a home for the benefit of their children and themselves.

The action of the parties in this respect amounted to condonation, which has been defined by this court as follows: Condonation is forgiveness for the past upon condition that the wrongs shall not be repeated. It is dependent upon future good conduct, and a repetition of the offense revives the wrong condoned. See, Kidder v. Kidder, 159 Neb. 666, 68 N. W. 2d 279; Wetenkamp v. Wetenkamp, 140 Neb. 392, 299 N. W. 491; Eicher v. Eicher, 148 Neb. 173, 26 N. W. 2d 808.

It is the plaintiff's contention that the defendant repeated the offense and revived the wrong condoned and by his subsequent conduct continued a course of cruel treatment toward the plaintiff.

The record is replete with confessions, admissions, and declarations of the parties as to their conduct involving each other. These standing alone, without corroborating evidence, would be insufficient to grant either party a divorce. Without considering the admissions,

confessions, and declarations of the parties with refer-
ence to quarrels, arguments, charges, and counter-
charges, there does appear in the record evidence of
extreme cruelty on the part of the defendant toward
the plaintiff. It would be impossible to detail these inci-
dents. We do, however, set forth briefly some of them.

The parties for some time had been having domestic
difficulties, and during September 1952, they voluntarily
appeared at the office of the county attorney. One or
the other of the parties had been in his office on four or
six occasions. These visits were occasioned by visits
had by the county attorney with law enforcement offi-
cers who had at times been called to the residence of
the parties. The plaintiff complained to the county
attorney with reference to the treatment she received
from the defendant and the physical and mental abuse
being done to her. The county attorney testified that
at that time she had a discolored eye.

The older daughter of the parties testified to argu-
ments had by them which occurred very frequently in
the home, and that the defendant struck the plaintiff
during the course of some of these arguments. She
did not recall any instance when the plaintiff struck the
defendant.

A neighbor of the parties testified that one time dur-
ing the winter of 1951 or early 1952, the plaintiff came
to her home one evening about 9 p.m. She had her small
daughter with her. The plaintiff was upset and had a
laceration behind one ear which was bleeding.

There is evidence in the record by a witness who saw
the defendant and a woman in his car early one morn-
ing in June 1954, and on another occasion one evening
in July 1955, and saw the same woman using the de-
fendant's car on one occasion in September 1955. There
is also testimony of another witness who saw the de-
fendant with this woman in his car. This woman was
known to both the plaintiff and the defendant.

On September 15, 1953, the plaintiff and her daughter

Dellouise went to the home of the defendant's parents for the purpose of getting the other children who were there. The defendant was also present. The plaintiff had received a telephone call having to do with the defendant's conduct. She accused the defendant of letting this particular woman out of his automobile and said she could prove it. Dellouise told the defendant that she had received the telephone call and what her mother was telling him was true. The plaintiff's father-in-law jumped to his feet, struck the plaintiff, and pushed her from the house. The defendant made no attempt to intervene or stop his father from striking the plaintiff during the course of this argument. A friend of Dellouise who had taken the plaintiff and Dellouise to the home of the defendant's parents testified that when the plaintiff came out to the car to return home she had a red mark on her cheek.

There is evidence to the effect that law enforcement officers were called by the defendant to the residence of the parties, apparently to take the plaintiff into custody on a charge that she was suffering from mental disability. However, she was not taken into custody. On September 9, 1953, the plaintiff's father-in-law filed a complaint against the plaintiff and a hearing was had on September 22, before the board of mental health. The defendant testified at that hearing from notes he had made from time to time relating to the conduct of the plaintiff toward him. This testimony was for the purpose of showing that the plaintiff needed mental treatment and perhaps confinement. The notes from which he testified were uncorroborated.

There is testimony by a matron in the office of the sheriff that on September 18, 1953, the officers were going to take the plaintiff into custody. When they arrived at the home of the parties the plaintiff had been working in the yard. She asked permission to use the telephone, which was granted. She was in a state of

shock, but, under the circumstances, was as rational as a person could be.

It appears that the complaint made against the plaintiff before the mental health board was not justified. It also appears that on the occasions when law enforcement officers were called to the home of the parties, apparently for the purpose of taking her into custody because of a mental condition, such calls were not justified. Even assuming, but not determining, that the plaintiff had required treatment for a mental condition, the conduct of the defendant toward the plaintiff with reference to such matter was inconsiderate of her feelings which caused her shock and nervousness, and amounted to cruelty on his part.

The plaintiff testified that prior to February 24, 1955, she had been receiving anonymous telephone calls of a disturbing nature with reference to the defendant being in the company of another woman. On or about February 24, 1955, the defendant called her, and two of her neighbors listened to the conversation on an extension telephone. This conversation need not be repeated, but is corroborated for the most part by the foregoing witnesses. In substance, in the conversation the defendant referred to the plaintiff as a dope addict, accused her of procuring drugs by playing up to the doctors, and accused her of running around to Crete and other places in cars and of immorality. When the plaintiff referred to the defendant spending weekends with a lady friend, he acknowledged he had, and stated that he and one of his lady friends had been to Keokuk, Iowa, plaintiff's former home, to check up on her reputation. The defendant called the plaintiff obscene and filthy names, and stated that he wished she had been killed in an automobile accident which she had.

There is evidence to the effect that the plaintiff, accompanied by a private detective and two police officers, visited the apartment of the defendant about 11:30 p.m., on an evening in April 1955, after he had separated

from her. The woman with whom the defendant had been in company on previous occasions was present.

Taking into consideration all of the evidence and considering it as this court must, de novo, the conclusion is that the plaintiff has sufficiently proved her charge of extreme cruelty against the defendant, and that the district court erred in refusing to grant her a divorce from the defendant.

This court has held: "In a divorce suit, where the court has jurisdiction of the parties, it has power to adjust all their respective property interests." Lippincott v. Lippincott, 144 Neb. 486, 13 N. W. 2d 721. See, also, Resnick v. Resnick, 137 Neb. 256, 288 N. W. 816; Bigelow v. Bigelow, 131 Neb. 201, 267 N. W. 409.

The division of property and allowance of alimony in divorce actions are always to be determined by the facts in each case. See, Francil v. Francil, 153 Neb. 243, 44 N. W. 2d 315; Lippincott v. Lippincott, *supra*.

In fixing the amount of alimony in a divorce action the court will take into consideration the estate of each party at the time of the marriage, their respective contributions since, the duration of the marriage, the wife's loss of her interest in the husband's property by virtue of the divorce, the social standing, comforts, and luxuries of life which the wife would probably have enjoyed except for the enforced separation, the conduct of the parties leading up to the divorce and to which party the divorce is granted, their age and condition of health, and all other facts and circumstances, and award an amount in alimony which appears to be fair and equitable between the parties. See, Phillips v. Phillips, 135 Neb. 313, 281 N. W. 22. See, also, Swolec v. Swolec, 122 Neb. 837, 241 N. W. 771; Messer v. Messer, *supra;* Lippincott v. Lippincott, *supra*.

The plaintiff and defendant were partners in the apartment house business. This partnership continued until it was finally determined, after there had been

some accumulation of properties and equities, that the business was too large for a partnership and by forming corporations there would be a savings consummated in many respects. Four corporations were formed, namely: The Capitol Real Estate Company, Capitol Apartments, Inc., Capitol Investment Company, and Capitol Land and Investment Company. The defendant managed these corporations, made investments, took care of rentals, and generally transacted all business in connection therewith.

The record shows that both the plaintiff and defendant have great affection for their children and desired to make adequate provision for their support in the future. To do this, there was created an irrevocable trust titled the "Workman Trust." Certain assets of the corporations heretofore mentioned make up this trust, and some accumulation of assets from the business have been added to this trust. Stock certificates, as shown by the testimony, disclose the number of shares of the different corporations comprising this trust. Dividends have been paid by the trustee from the trust to the defendant, as guardian, for the benefit of the children. The assets of this trust are approximately $180,000.

There was also created, as before mentioned, a revocable trust titled the "Frank M. Workman Trust" comprising assets of certain corporations evidenced by certificates of stock. This trust provided in part that it shall continue until the youngest child of the parties becomes of age, then makes provision that in the event the youngest child predeceases the other children the next youngest becoming of age would terminate the trust.

This trust was amended, and among other things provided in substance that in the event the plaintiff is living and the defendant not living at the time the trust would otherwise terminate, the trust shall continue during the life of the plaintiff and she shall be entitled to the income of this trust for her lifetime, but upon her death the benefits of the trust shall go to the surviving children.

In the event the defendant is living at the time the trust would otherwise terminate, then the trust shall continue for and during the period of his life, but upon his death the benefits of the trust shall go to the surviving children.

This trust agreement also provided that the donors reserved the right to amend or revoke this trust agreement in whole or in part at any time, and to withdraw all or any of the principal of the trust fund at any time upon written notice to the trustee signed by both donors, except in the event the defendant predeceased the plaintiff, then in that event the surviving donor shall not have the power to further amend or revoke the trust agreement, and that the trust shall not be changed at or after the death of the defendant.

The trust agreement then provided that upon the death of the defendant in the event he survives the plaintiff, all the trust property shall be delivered to the trustee under the irrevocable trust and shall be subject to the terms and conditions of that trust.

The assets of the revocable trust appear to be approximately $300,000.

We do not in this action disturb the irrevocable trust. It is not our purpose to determine the allegations of fraud alleged by the plaintiff in her pleadings against the defendant in transferring certain properties and placing the title thereto in his parents, or his parents forming other corporations separate and distinct from those previously mentioned allegedly controlled and managed by his parents, or now, his father being deceased, by his mother who claims an ownership interest in certain of the properties.

The record shows that there is a separate action pending in the district court charging the defendant with fraud with reference to such transfers and the making of promissory notes in which his parents are payees and which are claimed not to be collectible. The parties in the action for fraud, separate and distinct from the

instant action for divorce, are not before this court. Their rights are not determinable in an action such as this, under the record here presented. The trial court did not err in so holding.

We do not here disturb the revocable trust, but to arrive at the assets of the marital estate we have taken the same into consideration in awarding alimony.

It appears that the properties here involved are, for the most part, apartment house properties. The success of the business depends upon tenants and rents collected. The income from the business fluctuates, due to its nature. The properties are mortgaged, consequently the corporations have equities therein in most instances. We believe the value placed thereon by the plaintiff is somewhat excessive and inflationary. We conclude that the fair market value of the marital estate would be between $500,000 and $600,000.

We award alimony to the plaintiff as follows: She shall have and remain in possession of the home she now occupies with her minor children located at 940 South Cotner Boulevard for the purpose of making a home for herself and the minor children until such time as the youngest child becomes of age. The defendant shall pay the rent for the same, for the reason that it is an asset of one of the corporations heretofore mentioned under the management of the defendant. The defendant shall see that the taxes and fire and tornado insurance are kept up and paid, and also that the necessary repairs and upkeep are paid on the premises. In addition, the furniture now in the household and the household appliances in the household or in or about the premises, owned by one of the corporations, shall not be removed therefrom but shall be used by the plaintiff. The plaintiff shall be awarded alimony in the amount of $120,000, payable in equal monthly installments on the first day of each month from and after the mandate issues in this case and for a period of 15 years.

All judgments or orders for the payment of alimony

are liens upon the property, as in other actions, and may be enforced by proceedings in aid of execution, or other action or process as other judgments. See, § 42-319, R. R. S. 1943; Lippincott v. Lippincott, 152 Neb. 374, 41 N. W. 2d 232. The amounts of alimony payable to the plaintiff as heretofore set out constitute a lien on the property owned by the defendant or on any property in which he may have an interest.

We find that the plaintiff is a fit and proper person to have the care, control, and custody of the three minor children now in her custody and living with her at the home place, and award the plaintiff the sum of $200 a month for support and maintenance of the minor children of the parties until the sons Joseph and Robert Workman become of age, are self-supporting, or until the further order of the court, and thereafter the sum of $100 per month for the support of Francine Workman until she becomes of age, is otherwise self-supporting, or until the further order of the court. The defendant is to have the right to be with and visit the children at reasonable and proper times.

We award as costs to the plaintiff attorney's fees in the amount of $10,000, this amount to include $4,000 which has been allowed by the trial court. The cross-appeal of the defendant with reference to allowance of attorney's fees in the district court is denied. All costs of this action shall be taxed to the defendant.

For the reasons given herein, we reverse the judgment of the trial court and remand the cause with directions to enter judgment in conformity with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.