SERENA WALDBAUM, APPELLEE, v. SIDNEY WALDBAUM, APPELLANT.

107 N. W. 2d 407

Filed February 3, 1961. No. 34803.

Gross, Welch, Vinardi, Kauffman & Schatz, for appellant.

Marks, Clare, Hopkins & Rauth, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action for divorce brought by Serena Waldbaum as plaintiff in the district court for Douglas County, against Sidney Waldbaum, defendant. The defendant filed an answer and cross-petition wherein he prayed for a divorce. The trial court granted the plaintiff an absolute divorce from the defendant, and dismissed the defendant's cross-petition. The defendant filed a motion for new trial. The trial court overruled the defendant's motion for new trial, and the defendant perfected his appeal to this court.

The plaintiff's petition charged the defendant with extreme cruelty. She asked for custody of the minor children, child support, alimony, and division of the property acquired by the parties during the marriage.

The defendant filed a cross-petition in which he charged the plaintiff with extreme cruelty, and asked for the custody of the two younger sons of the parties and a return of certain property taken by the plaintiff from their home when she separated from the defendant.

The plaintiff's reply denied the allegations of the defendant's answer not admitted. The plaintiff, by answer to the defendant's cross-petition, denied the allegations therein contained not admitted, and alleged

other facts relating to extreme cruelty on the part of the defendant. The prayer was for a judgment in accordance with her petition.

In an appeal to this court in a divorce action the cause is tried de novo. Messer v. Messer, 157 Neb. 312, 59 N. W. 2d 395; Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368.

When the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version of the facts rather than the opposite. Stohlmann v. Stohlmann, 168 Neb. 401, 96 N. W. 2d 40; Dier v. Dier, 141 Neb. 685, 4 N. W. 2d 731.

We deem the following to be applicable to this appeal.

Any unjustifiable conduct on the part of either the husband or wife, which so grievously wounds the mental feelings of the other, or so utterly destroys the peace of mind of the other, as to seriously impair the bodily health and endanger the life of the other, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes "extreme cruelty." See, § 42-302, R. R. S. 1943; Smith v. Smith, 160 Neb. 120, 69 N. W. 2d 321; Egbert v. Egbert, 149 Neb. 227, 30 N. W. 2d 669; Workman v. Workman, supra.

Extreme cruelty may consist of personal injury or physical violence, or it may be acts or omissions of such character as to destroy the peace of mind or impair the bodily or mental health of the one upon whom they are inflicted or toward whom they are directed, or be such as to destroy the objects of matrimony. See, Messer v. Messer, supra; Workman v. Workman, supra.

It is impossible to lay down any general rule as to the degree of corroboration required in a divorce action, as each case must be decided on its own facts and circumstances. See, Schlueter v. Schlueter, 158 Neb. 233,

62 N. W. 2d 871; Hines v. Hines, 157 Neb. 20, 58 N. W. 2d 505; Workman v. Workman, *supra*.

The bill of exceptions in this case is voluminous. It would serve no useful purpose to detail the evidence of the respective witnesses.

For convenience we will refer to the parties as designated in the district court.

The record discloses that the parties were married in New York City, New York, on June 21, 1936. At the time of their marriage the plaintiff was 20 years of age, and the defendant was 22 years of age, and neither party had any substantial assets. At the time of trial the plaintiff was nearly 45 years of age and the defendant nearly 48 years of age. Four children were born as a result of this marriage: David Robert, born March 22, 1937; Caryl Lynne, born August 1, 1940; Howard Miles, born June 19, 1949; and Douglas Ralph, born January 19, 1953. The plaintiff finished high school, studied commercial art at the Pratt Institute, and studied 2 years in the New York School of Fine and Applied Arts. The defendant completed high school, attended college for 3 years, and then spent 6 or 7 months touring Europe. For a few years after the marriage the defendant was employed by S & W Waldbaum, Inc., a New York corporation engaged in the wholesale butter and egg business. The stock in the above corporation was originally owned by the defendant's father and later acquired by his two maternal uncles. After the outbreak of World War II, it was decided that S & W Waldbaum, Inc., should expand its operations and engage in business in the midwest. Thereafter the Twin Rivers Company, Inc., was formed under Nebraska law, with its headquarters at Grand Island, Nebraska, and the New York corporation as the sole stockholder. In the late spring or early summer of 1942, the parties and their family moved to Grand Island where the defendant managed the business of the Twin Rivers Company, Inc. Shortly after the formation of the Twin Rivers Company, Inc.,

the New York corporation sold its entire stock interest in Twin Rivers Company, Inc., one-third each to the defendant and his two maternal uncles, Abe and Jack Inkeles. Subsequently the defendant acquired some stock of the S & W Waldbaum corporation, and the plaintiff acquired some additional stock of such corporation by gift from one of the defendant's uncles, so that the combined interests of the plaintiff and defendant came to represent one-third of the stock issued and outstanding of the New York corporation. By gift from the defendant, the interests of the plaintiff and defendant in the New York corporation were ultimately held in the plaintiff's name. In 1954, following negotiations with his uncles by the defendant, it was arranged for the Twin Rivers Company, Inc., to purchase the outstanding stock of the defendant's uncles in the amount of $116,500, and for the plaintiff to give the defendant's uncles the one-third interest in the New York corporation which then stood in her name and was valued at $30,000, which would show the value of the Twin Rivers Company, Inc., as of that time in the amount of $219,750. The result of this transaction was to make the defendant the sole stockholder in the Twin Rivers Company, Inc., and to sever his connections with the New York corporation.

After moving to Grand Island, the plaintiff and defendant purchased a home at 1508 West First Street in that city. The plaintiff was unfortunate in having miscarriages in January and August 1954, and then began a course of psychiatric treatments, commencing with Dr. E. James Brady of Colorado Springs, Colorado, in the latter part of October 1954. Thereafter the plaintiff was treated by Dr. Frank R. Barta of Omaha, for a period from late October 1954 through the middle part of December 1955. As a part of this treatment the plaintiff was hospitalized from January 24 to February 19, 1955, for psychiatric treatment. In May 1956, the plaintiff began to see Dr. Phillip H. Starr, of Omaha,

a psychiatrist. He treated her until February or March 1959. During this time, the defendant was also treated by both Dr. Barta and Dr. Brady, and also was treated by Dr. Floyd Ring, a psychiatrist in Omaha who shared offices with Dr. Starr.

The course of treatment and the recommendations relating to the mental health of both the plaintiff and defendant are fully explained in the record. The record has been examined and considered in this respect, and the conclusions of the doctors need not be set out.

The testimony of the plaintiff is to the effect that the defendant started a course of conduct which constituted extreme cruelty towards her in either 1947 or 1948. The parties were raised in the Jewish faith, and the plaintiff was taught to believe in and observe the holidays of such faith. The plaintiff desired to raise the children in a belief in the Jewish faith. The defendant refused to observe the holidays of such faith, and apparently had no particular interest in religion. The actions of the defendant in this respect made the plaintiff unhappy and upset her because of his lack of cooperation with her relative to their religion.

It also appears from the record that the defendant refused, at the request of the plaintiff and their son David and others of the children, to attend certain ceremonies conducted by the Boy Scouts and the De Molay, a Masonic organization of which David was a member and at which he was to be honored. The defendant gave a very vague excuse for not attending such ceremonies and disclosed a lack of interest in the welfare of his eldest son at that time.

In 1952 or 1953, there was an argument between the plaintiff and defendant with reference to the defendant purchasing, from catalogs, jewelry, trinkets, household gadgets, and toys for the children which the plaintiff believed to be unnecessary and too extensive. The plaintiff desired to prove to the defendant that such orders of items were unnecessary, and she took from the de-

fendant the receipts and purchase sheets of articles and ran upstairs with them, with the defendant in pursuit of her. She ran into David's room and requested him to hold the receipts. The defendant came in and started to beat David with his fists. The plaintiff tried to pull the defendant off of David and the defendant struck the plaintiff with his hand and fist. At that time the defendant weighed close to 300 pounds, the plaintiff weighed approximately 130-odd pounds, and David weighed 160 pounds. The plaintiff then ran out of the room and called the police while the defendant kept beating David. However, David refused to give the defendant the invoices.

David testified that during the time he was residing with his parents and growing up, he heard arguments between the plaintiff and defendant on numerous occasions, through the night from midnight until 2 or 3 in the morning; and that such arguments were about business, people working in the defendant's plant, and matters relating to family life.

The plaintiff testified that on one occasion in 1956, when the defendant was standing in the kitchen door in the home in Grand Island, he started to quarrel with the plaintiff who was working and who ignored him. She became angered at the defendant and threw a piece of frozen meat at him. The defendant picked up this piece of meat and beat the plaintiff with it on the head, face, and shoulders. The plaintiff testified that she was quite stunned, and that she ran out of the house and went to the police. They suggested that she go to the hospital and call her doctor, which she did. The doctor gave her a sedative and recommended that she remain in the hospital overnight and get a good rest.

The plaintiff testified that on another occasion, after she had filed this action for divorce on July 28, 1958, the defendant switched cars with her while she was attending a function at the Town House in Omaha. She had separated from the defendant and resided in

Omaha at that time. When she came out to get the car it was gone and another car was in its place. She contacted her lawyer with reference to this matter and he informed her to wait until her husband came back to the house and then for her to take the car. At a later date the defendant returned to the plaintiff's home in Omaha and went into the house. The plaintiff endeavored to take possession of the car that the defendant had driven to her home. The defendant came out of the house, pulled the plaintiff out of the car, struck her, and she fell to the ground. This occurred in the presence of the plaintiff's children and her attorney.

The plaintiff further testified that during the past several years the defendant had made threats to commit suicide, and that this usually occurred when the defendant failed to have his own way. On at least two occasions the defendant left suicide notes in his own handwriting, one to the plaintiff and one to his mother. The one to his mother was not mailed, and was dated March 21, 1956. On this occasion the defendant talked about suicide, telling the plaintiff that he was going to take his own life for the reason that he was discouraged and had nothing to live for. The plaintiff endeavored to prevail upon him not to act in such a manner. On another occasion in the summer of 1956 or 1957, the defendant came home from his office at noon, put the car in the garage, which he usually did not do, and closed the garage door. He told the plaintiff he was unhappy, he didn't want to live, that he was a burden and no good to her or the children, and that he was going to take his own life. The plaintiff tried to persuade him not to do so. There was then some argument with reference to money which upset the plaintiff. The defendant went to the garage, but later left the garage unknown to the plaintiff. The plaintiff called the police, and they inspected the garage and later found the defendant sitting in the livingroom of his home in Grand Island. The defendant told the

police that his wife had made him miserable, and the police reprimanded the defendant. This apparently was done for the purpose of upsetting the plaintiff.

The record shows that in the early 1950's the defendant became obsessed with sex to an abnormal extent and insisted that the plaintiff indulge in unnatural forms of marital relations. Dr. Starr, a psychiatrist who treated both parties, described in detail the effect of this type of conduct on the part of the defendant toward the plaintiff which need not be repeated in this opinion, and testified that the defendant's conduct in this regard caused the plaintiff to become emotionally upset. Dr. Starr's testimony corroborated the plaintiff's testimony that the sexual appetites of the defendant revolted and disturbed her, and was the basic reason for her seeking psychiatric help. The doctor further testified that the defendant was in need of psychiatric help, and both the plaintiff and defendant did receive such help for some time. The record also shows that the defendant purchased books on sex relations of the erotic type, and also had a collection of nude photographs.

The record further shows that the defendant's conduct was that of a selfish, inconsiderate, self-indulgent, and egotistical individual. He testified concerning a passage in one of the sex books he purchased to the effect that there are many types of neurotic husbands; that there is the type who is egotistical, self-centered, and demanding; and that the wife of such a husband is expected to conform to his plans. The defendant felt that the words "egotistical, self-centered, and demanding" applied to him.

The record details many other acts such as arguments and controversies relating to the habits of each of the parties, and their conduct and actions toward each other which thoroughly indicate that these parties are unable to live in peace and harmony with each other and, as stated by their psychiatrists, should be separated at least temporarily.

From the record it is manifest that the acts of the defendant toward the plaintiff were sufficient to constitute extreme cruelty within the purview of the authorities heretofore cited, and we conclude that the trial court did not err in granting the plaintiff an absolute divorce.

The record shows that the defendant filed an action for divorce against the plaintiff on September 9, 1957. This was evidently for the purpose of inducing the plaintiff to return to him. She had previously separated from him, had lived in Omaha, and had taken an extended vacation in the east. The plaintiff did return to the defendant, and the defendant dismissed his action for divorce. This reunion lasted but a short time. Thereafter the present action was commenced by the plaintiff. The defendant contends that the plaintiff condoned his conduct of which she now complains as constituting extreme cruelty.

Condonation is forgiveness for the past upon condition that the wrongs shall not be repeated. It is dependent upon future good conduct, and a repetition of the offense revives the wrong condoned. See, Kidder v. Kidder, 159 Neb. 666, 68 N. W. 2d 279; Workman v. Workman, *supra*.

The defendant's contention with reference to condonation on the part of the plaintiff under the facts is without merit for the reason that there was a repetition of the offenses constituting extreme cruelty toward the plaintiff which would revive any wrong allegedly condoned.

The trial court by its decree granted the plaintiff the control and custody of Douglas, the youngest child of the parties, and granted the defendant the control and custody of Howard who was 10 years of age at the time of this trial.

The record shows that both the plaintiff and defendant have great affection for their children and are de-

sirous of making adequate provision for their care and support.

The statutory rule is: "Upon pronouncing a sentence or decree of nullity of a marriage and also upon decreeing a divorce, whether from the bonds of matrimony or from bed and board, the court may make such further decree as it shall deem just and proper concerning the care, custody, and maintenance of the minor children of the parties, and may determine with which of the parents the children or any of them shall remain. * * *." § 42-311, R. R. S. 1943. See, also, Smallcomb v. Smallcomb, 165 Neb. 191, 84 N. W. 2d 217.

In Stohlmann v. Stohlmann, *supra,* this court said: "In a case where the fixing of the custody of a minor child is concerned, the wishes of the child are not controlling, but if the child has reached sufficient age and has the ability to express an intelligent preference, such an expression is entitled to consideration." State ex rel. Bize v. Young, 121 Neb. 619, 237 N. W. 677, is cited.

Howard told the trial judge that he preferred to live with his father in Grand Island because he has an asthmatic condition which is an emotional problem, and when he is in Grand Island with his father he does not have such a condition; that there is a lady who stays at the home in Grand Island and cooks the meals and has care and supervision of him, and in addition there is a lady who comes at times during the week to clean the house and do the laundry; that he attends a school which is close to his home; that he does good work in school; that his father is generally home with him in the evenings and at other times; that he has no objection to visiting his mother from time to time under proper circumstances; and that he has friends and his interests in Grand Island and prefers to reside there with his father which would be the best thing to do under the present circumstances.

We conclude that Howard has shown a high degree of intelligence and manifested his desires in such a man-

ner as to warrant being placed in the custody, care, and control of his father, and the trial court did not err in placing the custody of Howard in the defendant, the trial court finding both parents to be suitable persons to have the care, control, and custody of the children.

It also appears from the record that at the time of the trial the plaintiff was employed at a mercantile store. Caryl, when she was not otherwise engaged, would be at home with Douglas. Also, the plaintiff has made provisions for the care of Douglas while she is employed.

Insofar as David is concerned, he is a graduate of Massachusetts Institute of Technology and was 22 years of age at the time of trial.

The decree of the trial court shows that beginning November 1, 1959, and continuing for 3 years, or until further order of the court, the defendant should pay $200 each month for the support of Caryl while she is residing with the plaintiff and attending college or university.

The trial court's decree required the defendant to cash United States Government E bonds of the face value of $4,100, and place the proceeds in an irrevocable trust whose corpus and income may be used only for the college education of Howard and Douglas, and must be distributed to them when they reach the age of 23 years.

Section 38-101, R. R. S. 1943, provides: "All persons under twenty-one years of age are declared to be minors; but in case a female marries under the age of twenty-one years her minority ends."

The general rules of the law of parent and child, being based on the child's incapacity, both natural and legal, and its consequent need of protection and care, apply only while the child is under the age of majority, and the father's legal duty to support his child ceases when the child comes of age. See, Annotation, 42 A. L. R. 150; 39 Am. Jur., Parent and Child, §§ 68, 69, pp.

708, 710; Breuer v. Dowden, 207 Ky. 12, 268 S. W. 541, 42 A. L. R. 146.

There are no circumstances shown in the instant case that would require the defendant to support his children upon their obtaining adulthood. Caryl will be 21 years of age on August 1, 1961. Consequently, any allowance for child support for her shown in the decree beyond that period of time should not be allowed, and we so hold.

Insofar as the irrevocable trust created by the trial court in favor of Howard and Douglas is concerned, this part of the decree should be vacated and set aside for the same reason as shown by the above authorities. It can be adduced from the record that the parties would not fail to provide adequate education for their children.

Insofar as the decree relating to the right of visitation of the parents to the children is concerned, we believe this is proper and that it should not be disturbed. The decree provides that the defendant is to have the right to have Douglas visit him one weekend, Friday evening through Sunday afternoon, each month, and the plaintiff is entitled to have Howard visit her under the same type of arrangement. It is also ordered that the boys should spend not less than 30 days of each summer vacation together, all of which is subject to further order of the court.

The trial court provided that the defendant should pay the sum of $125 each month for the support of Douglas, and that this amount be increased to $150 each month upon the termination of payments of support for Caryl. We believe that the sum of $125 a month would be sufficient for the support and maintenance of Douglas until there is an adequate and proper showing made, as provided for by law, that such amount should be increased.

By the decree the trial court required the defendant to maintain, keep in force, and pay the premiums on adequate hospitalization and medical insurance for the minor children, and to pay all extraordinary medical

and hospital expense incurred by or on behalf of the minor children, with the exception of fees of psychiatrists or plastic surgeons which would be allowed only upon order of the court. We believe that this part of the court's decree should be held for naught.

Section 42-312, R. R. S. 1943, provides: "If the circumstances of the parties shall change, or it shall be to the best interests of the children, the court may afterwards from time to time on its own motion or on the petition of either parent revise or alter, to any extent, the decree so far as it concerns the care, custody and maintenance of the children or any of them."

The division of property and allowance of alimony in divorce actions are always to be determined by the facts in each case. See, Francil v. Francil, 153 Neb. 243, 44 N. W. 2d 315; Workman v. Workman, *supra*.

"In determining the question of alimony or division of property as between the parties the court will consider the respective ages of the parties to the marriage; their earning ability; the duration of the marriage; the conduct of each party during the marriage; their station in life, including the social standing, comforts, and luxuries of life which the wife would probably have enjoyed; the circumstances and necessities of each; their health and physical condition; and their financial circumstances as shown by the property they owned at the time of divorce, its value at that time, its income-producing capacity, if any, whether accumulated or acquired before or after the marriage, the manner in which it was acquired, and the contributions each has made thereto. From these elements and all other relevant facts and circumstances, the court will determine the rights of the parties and make an award that is equitable and just." Spencer v. Spencer, 158 Neb. 629, 64 N. W. 2d 348.

This marriage lasted for a period of 23 years. There is no question but that the defendant supported the plaintiff and his children in a comfortable, generous,

and even lavish style. The family acquired a good social status and had many of the finer things of life.

The trial court's decree provided for a division of the property by awarding to the plaintiff the home purchased by her at 9424 Capitol Avenue, in Omaha, subject to taxes, liens, and encumbrances thereon, including a mortgage to an insurance company. The court found the equity in such home to be in the amount of $7,500. This home was purchased with the consent of the defendant. The court further awarded the plaintiff the household goods and furnishings contained in such home, except certain items which apparently were claimed by the defendant. The plaintiff was also awarded a 1959 Chevrolet Impala sedan valued at $2,000; the balance in a checking account carried in the name of the plaintiff in the amount of $2,500; and certain clothing and other articles belonging to the plaintiff, Caryl, and Douglas. The defendant was given credit for the sum of $8,000, representing the differential in bonds, home furnishings, cash in Caryl's possession or bank account, and unwarranted expense on the part of the plaintiff.

The court allowed permanent alimony to the plaintiff in the amount of $55,000, $5,000 payable within 10 days from the date of the decree and the balance of $50,000 to be paid at the rate of $400 each month commencing 1 month from the date of the decree and a like amount to be paid on the first day of each and every month thereafter until the sum of $55,000 is paid in full. The decree ordered that said payments of alimony totaling $55,000 should be deductible for income tax purposes by the defendant in accordance with pertinent regulations and provisions of the Internal Revenue Code.

The trial court awarded the defendant, as his sole and separate property, the home in Grand Island; the furniture, fixtures, and household goods contained therein; a stamp and coin collection, except that David's stamp collection should be delivered to him; 6 shares of stock

of the First National City Bank of New York City; 72 shares of stock in Manufacturer's Trust Company of New York City; all shares of stock, and all right, title, and interest in and to Twin Rivers Company, Inc., a Nebraska corporation; the total of $22,000 face value of United States Government bonds; all clothing and personal effects of the defendant and Howard located at either home or in storage at Grand Island; all articles and personal property in storage at Grand Island with the exception of those that belonged to Caryl and Douglas; the balance in the personal checking account of the defendant; and a 1953 Packard automobile now titled in the name of the plaintiff, and the court ordered the plaintiff to execute the title certificate to the defendant. The defendant was ordered to pay all family bills owing as of September 1, 1959, in the total amount of $2,360.96. The decree further ordered that the defendant should in the future have the right to take as exemptions under his personal income tax return Caryl, Douglas, and Howard, as long as he continues to pay the child support as provided under the decree; and that the defendant pay the costs of the action, including attorneys' fees in the amount of $5,000, to be payable forthwith to the clerk of the district court. The trial court divided the $5,000 fee as $2,500 payable for services rendered in obtaining the divorce, and $2,500 for services rendered in connection with the property litigation. The decree was rendered accordingly.

While the trial court states in the decree that the plaintiff shall be awarded as permanent alimony and division of property the total sum of $75,000, being items of real and personal property, cash, and stock, and then made a provision awarding the plaintiff $55,-000 as permanent alimony as heretofore mentioned, it should be stated that the items constituting the equity in the home in Omaha, the Chevrolet Impala sedan, the checking account, and the $55,000 alimony payable as provided for by the decree, constitute a total of $67,000.

The difference between the $75,000 and $67,000, or $8,000, was the credit given to the defendant on differential in bonds, home furnishings, cash in Caryl's possession or bank account, and unwarranted expense on the part of the plaintiff.

We have heretofore set out that part of the trial court's decree relating to child support and the creation of an irrevocable trust, and have determined the same.

The record discloses a sharp conflict in the evidence as it relates to the value of the personal and real property owned by the plaintiff and defendant. This is especially true with reference to the value of the stock of the Twin Rivers Company, Inc., owned exclusively by the defendant, and the value of the business conducted by such corporation which is an egg processing business. True, it is a business that fluctuates, in other words, in some years it returns a substantial profit while in others it sustains a loss. However, generally speaking the returns from such business have shown it to be a substantial business, and its present and future status is not as discouraging as the defendant testified. Neither the plaintiff or defendant, for the most part, gave a fair, complete, or accurate valuation of the property owned by each which is involved in this case. There is no question but that the trial court gave careful consideration to the record upon this phase of the case, as did this court. We conclude, from a review of the evidence on this phase of the case, that it fully sustains the trial court's judgment with reference to a division of the property between the parties here involved, and the allowance for permanent alimony.

We conclude that the decree of the trial court should be modified with reference to child support, as heretofore set forth; that the irrevocable trust created by the trial court for the benefit of Howard and Douglas should be held for naught; that the defendant should be required to pay the plaintiff $5,000 in cash as an alimony payment within 30 days after the issuance of the man-

date in this case and attorneys' fees as allowed by the trial court in the amount of $5,000 within the same period of time; and that the part of the trial court's decree requiring the defendant to maintain, keep in force, and pay the premiums on adequate hospitalization and medical insurance for the minor children and to pay all extraordinary medical and hospital expenses incurred by or on behalf of the minor children with the exception of fees of psychiatrists or plastic surgeons which would be allowed only on order of the court, should be held for naught for the reason hereinbefore stated. We award as costs to the plaintiff attorneys' fees in the amount of $2,500 for services rendered by plaintiff's attorneys in this court. In all other respects we find the decree and judgment of the trial court to be correct.

For the reasons given herein we affirm in part and in part reverse the judgment and remand the cause to the district court with directions to enter judgment in conformity with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

ELLWOOD B. CHAPPELL and PAUL E. BOSLAUGH, JJ., not participating.